Filed 10/6/22  P. v. Chacon CA5
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANTHONY CHACON,<br><br>    Defendant and Appellant. | F077849<br><br>(Super. Ct. No. BF142972A)<br><br><br>**OPINION** |

---

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Rebecca P. Jones, under appointment by the Court of Appeal, Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Christopher J. Rench, and Jamie A. Scheidegger, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In June 2014, a jury found defendant Anthony Chacon to have been the shooter in a drive-by shooting that targeted defendant's fellow gang member.[1] Although the intended victim was unharmed, a ricocheting bullet struck and killed a two-year-old girl who was playing in her front yard. The jury convicted defendant of first degree drive-by murder (Pen. Code,[2] §§ 187, 189; count 1), attempted murder (§§ 187, 664; count 2), and shooting at an inhabited dwelling (§ 246; count 3). As to count 1, the jury found defendant committed the murder by means of a drive-by shooting and to further the activities of a criminal street gang (§ 190.2, subd. (a)(21) & (22)); personally discharged a firearm causing death (§ 12022.53, subd. (d)); inflicted great bodily injury or death by shooting a firearm from a motor vehicle (§ 12022.55); and committed the murder for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)). As to count 2, the jury found defendant personally discharged a firearm (§ 12022.53, subd. (c)), and committed the crime for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)). As to count 3, the jury found defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang (*ibid.*).

On July 18, 2014, defendant was sentenced to prison for an unstayed term of life in prison without the possibility of parole plus 25 years to life pursuant to section 12022.53, subdivision (d) on count 1, plus 15 years to life plus 20 years pursuant to section 12022.53, subdivision (c) on count 2. The court imposed a restitution fine

---

[1] Pursuant to Evidence Code sections 452, subdivision (d) and 459, we take judicial notice of our records and opinions in *People v. Anthony Chacon*, F069786 and *People v. Anthony Chacon*, F075542.

[2] All statutory references are to the Penal Code unless otherwise stated.

(§ 1202.4, subd. (b)) in the amount of $240,[3] imposed and stayed a parole revocation fine (§ 1202.45) in the same amount, imposed a court operations assessment (§ 1465.8) in the amount of $120, and imposed a court facilities funding assessment (Gov. Code, § 70373) in the amount of $90.  It awarded defendant 739 actual days' credit but no local conduct credits.  (See § 2933.2.)

Defendant appealed.  This court found the sentence on count 2 was unauthorized, because the jury did not make the premeditation finding necessary for imposition of a life term pursuant to section 664, subdivision (a).  Accordingly, we vacated the sentence on that count, remanded for resentencing, and otherwise affirmed.  (*People v. Chacon* (Oct. 21, 2016, F069786) [nonpub. opn.] (*Chacon I*).)

Defendant was resentenced on count 2 on April 26, 2017.  After finding no circumstances in mitigation and several in aggravation, the trial court imposed the upper term of nine years, plus 10 years for the section 186.22, subdivision (b)(1)(C) enhancement, plus 20 years for the section 12022.53, subdivision (c) enhancement, to be served consecutively to count 1.  The financial obligations were unchanged, but the trial court updated defendant's credits to 1,752 actual days.

Defendant again appealed and, after initially filing a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436, requested a remand so the trial court could exercise its new discretion to strike the firearm enhancements pursuant to section 12022.53, subdivision (h), as amended by Senate Bill No. 620 (2017-2018 Reg. Sess.).  We remanded the matter for that purpose and otherwise affirmed.  (*People v. Chacon* (Mar. 28, 2018, F075542) [nonpub. opn.] (*Chacon II*).)

The trial court heard the matter on July 20, 2018.  After finding four circumstances in aggravation but none in mitigation, and specifically remarking on the gravity of the

---

[3] This was the minimum amount of such a fine in 2012, when defendant committed his offenses.  (§ 1202.4, former subd. (b)(1).)

3.

case and defendant's prior record, the trial court reiterated the previously imposed sentence, including, "following [the court's] exercise of discretion," the section 12022.53, subdivision (d) enhancement as to count 1 and the section 12022.53, subdivision (c) enhancement as to count 2. The court also reiterated the previously imposed financial obligations, and updated defendant's credits to 2,202 actual days.

Defendant again appealed. After initially filing a *Wende* brief, appellate counsel requested, and was granted, permission to file a brief, in which she argued (1) the trial court failed to recognize it had discretion to impose a firearm enhancement under section 12022.53 that carried a lower sentence, (2) the matter must be remanded for the trial court to consider defendant's ability to pay fines and fees in accordance with *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), and (3) the abstract of judgment must be amended either to reflect the sentence and custody credits pronounced on July 20, 2018, or to reflect the sentence and custody credits pronounced following an anticipated remand.

In our original opinion, a majority of this court held: (1) the trial court had no discretion to impose an enhancement under section 12022.53 that carries a lower sentence because no such enhancement was alleged, (2) remand for consideration of defendant's ability to pay fines and fees was unwarranted in light of the record, and (3) the trial court was not required to issue an amended abstract of judgment. Accordingly, we affirmed.

Defendant petitioned the California Supreme Court for review, arguing in part that the trial court had discretion to reduce the firearm enhancement imposed pursuant to section 12022.53. The state high court granted review (S263743) and ultimately transferred the matter to us with directions to vacate our opinion and reconsider the cause in light of *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*), which held that a trial court may impose a "lesser included, uncharged enhancement" under section 12022.53, so long

4.

as the "facts supporting imposition of the lesser enhancement have been alleged and found true." (*Tirado*, at p. 697; see *id.* at p. 700.)

Pursuant to the California Supreme Court's order, we vacated our prior opinion and solicited supplemental briefing limited to "matters arising after our previous decision in this cause." (Cal. Rules of Court, rule 8.200(b)(2).) In supplemental briefing, defendant argues he is entitled to remand for the court to exercise its discretion pursuant to *Tirado*. He additionally argues he is entitled to (1) reversal of the gang enhancements and gang-related special circumstance due to recent amendments to section 186.22 (Stats. 2021, ch. 699, § 3); (2) reversal of the entire judgment pursuant to newly enacted section 1109, which requires bifurcation of the trial of certain gang-related allegations (Stats. 2021, ch. 699, § 5); (3) reversal of the entire judgment, or at least the gang enhancements and gang-related special circumstance, pursuant to *People v. Valencia* (2021) 11 Cal.5th 818 (*Valencia*) based on the admission of prejudicial, case-specific hearsay; and (4) reconsideration of the sentence pursuant to Assembly Bill No. 518 (2021-2022 Reg. Sess.), statutes 2021, chapter 441 (Assembly Bill No. 518). He also asks that we revisit our prior holding that reversal was not warranted based on the admission of hearsay testimony regarding one of the victim's gang membership. (See *Chacon I*, *supra*, F069786.)

We will reverse the true findings on the gang enhancements and gang-related special circumstance pursuant to *Valencia*. In light of this disposition, we will vacate the sentence in its entirety and remand for further proceedings, to include a full resentencing. In all other respects, we affirm.

## FACTUAL BACKGROUND

Because defendant's arguments relate in part to the trial evidence, we reiterate our factual summary from defendant's first appeal.

# "I

## "PROSECUTION EVIDENCE

### "*The Shooting*

"A three-unit apartment complex stands on the northwest corner of Virginia Avenue and South Robinson, in Bakersfield.  The units face east toward Robinson.  There is a stop sign on Robinson at Virginia.  The parking lot for the complex is at the north end of the complex, and is separated from the units' front lawn by a chain-link fence with a gate.  A cement walkway leads from each of the three front doors to the sidewalk and curb running along Robinson, but the chain-link fence surrounds the yard so there is no curb access.

"As of April 30, 2012, Jeffery [L.], Anna [M.], and Aaron [N.] resided in apartment A, the first unit nearest the corner of Virginia and Robinson.[4]  Also residing there were Katie [W.], her boyfriend Lynn [H.], her two-year-old daughter [K.], and her four other children.[5]

"That day, Ricardo [R.] and his friend, Raymond 'Caveman' Velasquez, a Hispanic man who lived in the neighborhood, decided to walk to the store.  Velasquez was wearing a black shirt [Ricardo] had loaned him.  They walked south on Robinson, intending to turn west on Virginia.  As they reached the northernmost edge of the apartment complex's parking lot, [Ricardo] saw a dark blue SUV (sports utility vehicle) that could have been a Tahoe or Yukon.  The SUV, which was facing south, was parked at a pink house just north of Murdoch, the first street to intersect Robinson north of Virginia.  Two men, who appeared to be Hispanic, were outside the SUV.  They were staring in the direction of [Ricardo] and Velasquez.

---

**4** "Unspecified references to dates in the [factual background] are to the year 2012."

**5** Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.  No disrespect is intended.

"[Ricardo] and Velasquez ignored the men and continued on toward the store. Near the corner of Virginia and Robinson, Velasquez stopped outside the fence to talk to a Black man he knew. [Ricardo] was also on the sidewalk outside the fence, but about 10 feet north of Velasquez.

"The conversation lasted five to 10 minutes, whereupon the SUV pulled up. As it was pulling up, [Ricardo] saw the driver and someone in the front passenger seat. He could not see into the back seat, because the windows were tinted. The front windows were rolled down, however.

"The SUV stopped with the passenger window next to Velasquez. Someone in the SUV asked, 'hey, you guys trippin'?' [Ricardo] did not know who said it. [Ricardo] and Velasquez were shocked, because the phrase essentially asked whether one group was having problems with the other, and it often was associated with some kind of fight or threat. [Ricardo] heard Velasquez talking with those in the SUV, but the exchange did not sound angry, and he heard no gang slogans. About two or three minutes after the SUV pulled up, however, [Ricardo] saw the passenger's hand sticking out of the car. The passenger was holding a gun that appeared to be a semiautomatic. Shots were fired. Velasquez, who was seven or eight feet from the vehicle, was not hit, although the shirt Velasquez was wearing had a hole in it after the shooting that was not there when [Ricardo] loaned him the garment.[6] One of the bullets hit the curb or sidewalk, causing some of the cement to strike [Ricardo]'s leg. [Ricardo] and Velasquez fled.

"Sometime after the shooting, [Ricardo] was shown a photographic lineup.[7] He was unable to identify anyone in the SUV. At trial, he testified he did not see anyone in

**6** "According to Bakersfield Police Detective Moore, it was a bullet hole without a corresponding exit hole. The hole was about the size of a .45-caliber bullet. Velasquez told Moore that when he heard the shots, he moved his body, and he thought that was why there was only the one hole."

**7** "Each of the photographic lineups shown in this case contained defendant's photograph in the number three position."

7.

court whom he remembered being inside the vehicle. According to Moore, who interviewed [Ricardo], [Ricardo] was reluctant to tell Moore everything he knew. [Ricardo] told Moore he saw the right front passenger lean out of the SUV. [Ricardo] described him as a Hispanic male, with facial hair and some hair on his head that was not too long or too short. He also said the shots came from the right front seat of the vehicle, and that he saw the gun.

"[Lynn] recalled all the children, including [K.], playing in front of the apartments when he walked outside to head for his car in the parking lot. Velasquez, whom [Lynn] knew as Caveman, was on the sidewalk outside the fence. [Lynn] did not see any other people outside the fence, but he did see a dark blue Navigator.

"[Lynn] was at the gate when shooting started. He turned around and saw what looked like fireworks bouncing off the ground, but they were bullets ricocheting. Someone was leaning out of the car with a gun in his hand. Although the windows in the Navigator were tinted, [Lynn] was able to see the driver and front passenger— defendant—as the vehicle drove off southbound on Robinson after the shooting. [Lynn] did not get a good look at the driver, who was Hispanic.

"[K.] was lying on the ground. [Lynn] picked her up, put her in his car, and drove off. When he saw some sheriff's deputies, he gave her over to them. [K.] subsequently died from a penetrating gunshot wound of the body. The bullet entered [K.]'s right chest, perforated a lung and her diaphragm, perforated one of her vertebrae, and lodged in the soft tissue of the left back.

"[Lynn] was interviewed by Moore approximately eight hours after the shooting. [Lynn] gave Moore a description of a Hispanic male who could have been bald. The man was not wearing sunglasses and did not have any piercings. [Lynn] did not know if the man had facial hair. [Lynn] said he was able to get a good look at the shooter's face because the shooter leaned out of the vehicle from the right front seat. Moore showed [Lynn] a photographic lineup sometime in May. When Moore asked if [Lynn] could

identify anyone, [Lynn] wrote 'not sure.' At trial, [Lynn] explained he did so because he did not want to have to go through this. Thinking of [K.] changed his mind.[8]

"[Jeffery] recalled standing in the grass between the first and second apartments, a couple of feet from the fence, playing with [Katie]'s children. A large Hispanic male, wearing black shorts, a black shirt, and a Pittsburgh Pirates hat, walked up and stopped to talk to [Lynn]. [Lynn] was standing on the grass near the stop sign. The two men talked for about 10 or 15 minutes, during which time [Jeffery] saw a black Ford Expedition with tinted back windows circle twice around the block. [Jeffery] saw the passenger twice; he was a Hispanic man with short hair. At trial, [Jeffery] identified him as defendant. [Jeffery] did not get a good look at the driver.

"[Jeffery] saw the SUV sit for five or 10 minutes by a pink house a block away, on the corner of Murdoch and Robinson.[9] He did not see anyone get in or out of the vehicle. It then drove straight down to [Jeffery]'s location and stopped at the stop sign. Defendant had words with [Lynn] (who is Black) and the Hispanic male dressed in black. Defendant said, 'Varrio Bakers,' then fired six or seven shots a few seconds later.

---

[8] "[Lynn] was in custody on unrelated matters at the time he testified. It was his understanding he would be released on his own recognizance after he testified. He was not promised anything else."

[9] "Adriana [S.], who had a child with defendant, lived in the pink house on the day of the shooting. That day, defendant dropped their child off after having her overnight. When interviewed by Moore, [Adriana] said defendant was the right front passenger in a blue Blazer- or Expedition-type vehicle. The only people in the car were defendant and the driver, whom she described as a 'Paisa,' meaning a Mexican who was not a gangster. She also told Moore that right after the shooting, Velasquez (whom she identified from a photograph) and another Hispanic male ran into her yard. They demanded to know who the person was who parked in front of her house, said he had just tried to shoot them and had shot a little girl, and threatened that whoever came to her house was going to get shot. At trial, [Adriana] claimed the police pressured her to say things, and she had no knowledge what kind of car defendant was in when he dropped the baby off, how many people were in the car, or who was sitting where. A video recording of her interview with Moore was played for the jury."

Although [Jeffery] did not actually see when the shots were fired, he had glanced over when the men were talking, and only the right-side window was open. Only defendant was talking to the Hispanic male. Defendant was leaning forward. The Hispanic male was right in front of the passenger window, but he was standing back from the car. After the shots were fired, the SUV turned left at the stop sign onto Virginia and drove off.

"[Jeffery] was interviewed at the scene, and later at the police department. At the scene, he told Bakersfield Police Officer Anderberg that the vehicle involved was a blue Lincoln Navigator with four Hispanics inside, one of whom was wearing a black and gold Pittsburgh Pirates hat.[10] He also said there were two Hispanic males on the sidewalk. When shown a photographic lineup on May 19, he was unable to identify anyone. After an arrest was made, [Jeffery] saw defendant's photograph in the newspaper. He knew then it was the person he had seen.

"[Anna] recalled that just before the shooting, she was standing in the front yard, talking on the phone. [Lynn] was standing near the gate to the parking lot, talking to a group of three or four males. [Aaron] was inside the apartment. [Katie] was at school.

"[Anna] saw a powder blue Expedition or Explorer at a pink house a block down the street. It sat there for 10 to 15 minutes, during which time [Anna] did not see anyone get in or out. The vehicle then started rolling up and a group of males in the car started having a conversation with someone outside the car. Two Hispanic males were walking up the street, but those in the SUV were only talking to one of them, who walked up to the vehicle. The two males had come from the direction of the pink house. [Anna] could not really see who was in the SUV; the front windows were rolled down just enough for them to talk to the male outside the vehicle. The back passenger side window was down,

---

**10** "Anderberg was dispatched to the apartment complex at approximately 7:00 p.m. in response to a report of a shooting. It was still light out when the shooting occurred."

10.

but [Anna] could not see the person in the back seat by that window because he was sitting back.

"[Anna] could not tell which person in the SUV was talking to the male on the street. No voices were raised; she thought the men were just having a conversation, as opposed to an argument. The conversation lasted five or six minutes, during which time the SUV was stopped at the stop sign. Suddenly, the male outside the SUV turned around, covered his head with his hands, and bent over slightly, and shots were fired at him from inside the SUV. The Hispanic males on the sidewalk were approximately eight or nine feet from the SUV. More than two shots were fired, and sparks and water flew up from the gutter. [Anna] did not hear anyone yell 'Varrio' before the shots were fired. The two men on the sidewalk ran off. The SUV crossed Virginia and continued on Robinson.

"At the time the shots were fired, [K.] was playing in the grass area directly in front of the middle apartment, roughly in the area where [Jeffery] was standing. [Anna] turned to get the children into the house, and saw [K.] lying on the ground. She had been shot. [Lynn] picked her up and started to drive her to the hospital.

"Moore interviewed [Anna] at the scene.[11] She told him she could not tell what kind of words were being said by the people involved in the shooting, but it seemed like they were friends. The only thing she heard was 'Varrio somethin',' and she could not tell if it came from the car or the man on foot. She described the vehicle as a powder blue SUV. Shown a photographic lineup, [Anna] wrote 'not sure,' meaning she was unable to identify anyone as having been inside the SUV. When asked at trial if she saw anybody who was inside the vehicle, she stated she did not remember what they looked like.

---

**11** "An audio recording of the interview was played for the jury."

11.

"There was damage consistent with a bullet strike on the cinder-block wall on the north side of the apartment complex parking lot, on a mailbox in front of the apartment complex by the sidewalk for the middle apartment, and to the front wall of the middle apartment. There was also a possible bullet skip or strike to the sidewalk leading from the first apartment. This mark indicated the bullet was traveling northwest, toward the corner of the apartment complex, when it skipped. A large-caliber bullet was recovered from [K.] during the autopsy. One side was flattened at a slight angle. It appeared to have hit a hard object, such as concrete. The damage to the bullet was consistent with the mark on the sidewalk.

"Six expended .45-caliber shell casings were found at the scene. All were determined to have been fired from the same gun. The spent shell casings were processed for latent fingerprints and swabbed for DNA. While no prints were located, a DNA profile was obtained from the swabs. It was a mixture of at least two people, at least one of whom was male. Defendant was a major contributor to the profile.

"Early in the investigation, Moore received information on a number of potential suspects. Prior to trial, nobody expressly identified defendant. During his first meeting with Velasquez, however, Moore asked Velasquez to look at the photographic lineup and see if he could identify the shooter. Velasquez's demeanor was helpful but evasive. During Moore's second contact with Velasquez, Moore asked if one of the people in the photographic array looked familiar. Velasquez was holding the page of photographs in front of his face. Moore, who was next to him, could tell he was staring at the number three position.

"Moore first came in contact with defendant on July 10, and interviewed him that afternoon.[12] Defendant, who had been in Mexico when taken into custody, stated he no longer associated with the Varrio Bakers, although he was 'from the neighborhood.' He

---

[12] "A video recording of the interview was played for the jury."

12.

denied being in that neighborhood on April 30.  A friend of his drove him to Mexico at defendant's request.[13]  Defendant went to visit his grandfather at his grandfather's ranch, only to discover he had passed away.

"Asked about the pink house, defendant said he used to go there a long time ago, to visit a friend of his from school.  He did not know her name.  He acknowledged she said they had a child together, but he was not sure the baby was his.  He took the child one time to visit his family and friends, but had forgotten the little girl's name and the date he took her.  A friend drove him, but he could not recall the friend's name or the kind of vehicle they were in.  It was not an SUV, however; although defendant did not drive, he was always either in a Mercedes or a red Mustang.  After dropping the baby off, defendant—who was in the passenger seat as always—and the driver turned back around. Defendant did not exchange words with anyone.  Defendant denied knowing anything about what happened or that the police were looking for him; he did not watch television, and he had a new phone when he went to Mexico.  He denied being present at the shooting.

"*The Gang Evidence*

"Moore had been an officer with the Bakersfield Police Department since 1996, and a law enforcement officer for several years before that.  He was one of the officers who dealt with gang neighborhoods and gang arrests before the police department had a gang unit.

"Moore explained that the Varrio Bakers gang is a group of people who are loosely associated with Southerner gangs.  The Varrio Bakers are known to commit

---

**13** "Defendant was coming back into the United States from Mexico when he was contacted by a law enforcement agency.  He was taken into custody by Calexico police on a murder warrant in this case."

13.

murders, robberies, burglaries, and crimes that support the gang generally. The location of the shooting in this case was within Varrio Bakers territory.[14]

"Moore explained that tagging is a way gangs mark their territory. Varrio Bakers commonly use 'VB' and 'VBKS.' They also use '3' and 'X3,' which relate to 13 and the fact the Varrio Bakers are correlated with Southerner street gangs. A lot of Southern street gangs use 13 to show allegiance to the Mexican Mafia prison gang. At the time of the shooting, there was Varrio Bakers tagging on an abandoned building on the northeast corner of Virginia and South Robinson, and also on a wood fence along Virginia, just to the west of the scene. At the time Moore interviewed defendant, defendant had a large VB tattoo visible on the top of his head.[15] Defendant did not, however, have any gang convictions.

"Moore explained that Southern gangs have rules against their members shooting from vehicles, because unintended victims can be killed. There are also rules about killing children, because they are innocent and not part of the gang lifestyle. The crime in this case violated those rules. This led to the police receiving more assistance from people than they normally would get in a regular gang killing. Even so, it was difficult to gain cooperation from some of the witnesses. Snitching—helping the police—also violates gang rules and can result in one getting killed.

"Moore explained that mere membership in a gang is not illegal, but conduct in association with gang activity can be. The conduct has to further the street gang's operations or somehow benefit the gang.

---

[14] "The area was also in the territory of the Eastside Crips, a Black gang."

[15] "During the interview, defendant gave the address of his father's house and said defendant had always used it as his address. The address was in the territory of Loma, another Hispanic street gang. According to Moore, it was not 'out of bounds' for a family member of one gang to reside in the area of another gang."

14.

"On September 12, 2005, Bakersfield Police Officer Woolard came in contact with defendant during a traffic stop. Among his tattoos, defendant had 'Varrios' tattooed on his chest. Defendant said he had had the tattoo shaded in about two months earlier, while he was intoxicated.

"On September 16, 2011, Bakersfield Police Detective Sherman assisted a parole officer in arresting Anthony Hernandez, a Varrio Bakers gang member with the moniker 'Green Eyes.' Hernandez and defendant were found inside a house. Defendant was underneath the covers in one of the back bedrooms.

"On June 7, 2012, Bakersfield Police Officer Littlefield came in contact with Alfred Herrera, a Varrio Bakers member who was older than the typical 18- to 25-year-old members with whom police normally had contact. During the course of their conversation, Herrera said he was familiar with the current case involving defendant. Herrera said Velasquez was a member in bad standing with the Varrio Bakers.

"Deputy King, of the Kern County Sheriff's Department detention bureau, had been a classifications deputy for approximately 14 years. He explained that in jail parlance, a 'kite' is a handwritten note by which jail inmates communicate with each other. Kites generally are passed hand to hand.

"King knew defendant, who was housed in unit 2 of C pod at the Lerdo pretrial facility. A handwritten note was seized that read 'Chacón VBKS' near the signature line. The note contained housing information for what it termed the 'C-2 Active Homies.' Two of the names listed were 'Chacón VBKS' and 'Kave-man Colonia Bakers.' The note also bore 'the Kanpol,' a common symbol used by Southern Hispanic criminal street gang members. It is two lines or bars, each of which represents five, and then three dots. It is a Mayan numeral 13 used to show allegiance to the Mexican Mafia.

"In April 2014, King came into possession of another kite. This note was what inmates refer to as a 'roll call.' In a roll call, all active members have to supply their name, booking number, date of birth, neighborhood with which they associate, and

15.

moniker to the member of the criminal street gang or prison gang who runs that specific housing unit. That person is appointed by an influential member of the specific gang, in this case, the Southern Hispanics, also known as Sureños. Velasquez, who was in custody, put his identifying information, including his booking number, on this kite, along with his moniker, 'Caveman.' He identified with the Varrio Bakers criminal street gang.

"As of the time of trial, Bakersfield Police Officer Malley had been a peace officer for seven and a half years, and had been in the gang unit—his current assignment—about a year and a half.[16] Prior to that, he worked in the patrol division. He received training on criminal street gangs while in the police academy in 2006.[17] After he graduated from the academy, he went into a field training program, where he was under the supervision of a more senior officer. His field training officers had both been in the gang unit at some point. While in the field training program, Malley had frequent contact with individuals believed to be members of criminal street gangs. Malley was taught about indicia of gang membership, gang territories, gang rivalries, and the like.

"After he completed his field training, Malley was placed on probationary officer status for a year, then hired as a permanent employee. While on probation, he was on patrol and had contact with individuals he believed were gang members almost on a daily basis. One of the beats he worked encompassed the area of Virginia and South Robinson. During his time on that beat, he contacted suspected gang members at least several times

---

**16** "Because defendant challenge[d] Malley's qualifications as an expert, we set out the pertinent testimony in some detail."

**17** "Malley received 14 hours of classroom-level training, which included gang identifiers, common signs and symbols, tattoos, information about monikers, traditional boundaries, and the types of crimes gang members commit. It also included a tour of the various gang neighborhoods of Bakersfield. The course was taught by a senior police officer in the special enforcement (gang) unit. As of the time of trial, that officer was a sergeant in the gang unit."

a week.  When he became a patrol officer, he was assigned to the same general area.

After he was hired as a permanent employee, and as a member of the gang unit, Malley

received additional training in criminal street gangs.[18]

"Malley believed the Varrio Bakers started in the 1950's or thereabouts, although

he did not know the exact year.  They began in the central eastern portion of Bakersfield.

He did not know the founding member's name.  He did not know the exact membership

number as of the time of trial, because it was constantly changing, but knew the gang had

somewhere about 100 and 1,000 members.  Malley had heard from various sources that

Richard 'Puppet' Luevano was running the Varrio Bakers as of the time of trial.  Malley

did not know, however, who the 'shot-callers' of the Varrio Bakers were on the date of

the shooting.[19]

"Malley, who had never before testified as an expert on the Varrio Bakers

although he had testified concerning several other Sureño and local street gangs,

explained that there is a gang called Southerners or Sureños that encompasses the Varrio

Bakers.  It is a gang as a whole, and is a combination of all other subsets, of which the

Varrio Bakers is one.  He explained that a crime done for the benefit of the gang can be

---

**18** "In 2008, Malley attended an eight-hour refresher course, given by the Bakersfield Police Department's special enforcement unit.  In 2012, he attended a four-day (40-hour) gang awareness instruction course, which was given by the Bakersfield Police Department, the California Department of Corrections and Rehabilitation, and the Kern County District Attorney's Office.  In 2013, he attended a four-day (40-hour) National Gang Investigators Association conference held in Anaheim, which contained information on local street gangs and street gangs in Southern California, including Crip and Sureño criminal street gangs.  He had also read two books—*A Guide to Understanding Street Gangs*, by Dr. Al Valdez, and *The Mexican Mafia Encyclopedia*, which was written by two former Mexican Mafia gang members.  Both books were specific to Crips and Sureños.  There was information in the latter book that referenced local Sureño street gangs by name."

**19** "Malley explained that a shot-caller within a gang is someone who has a tremendous amount of respect and power, and controls members with less status.  The shot-caller controls other members' activities."

any crime committed by a gang member that benefits either the status of the gang within the gangs in Kern County, or benefits the reputation of the gang and basically instills fear into members of the community. Although the killing of a two-year-old child will not enhance a single gang member's status within the particular gang, it will enhance that gang's reputation in the community as being ruthless and having the ability to kill people.

"During his time on patrol and in the gang unit, Malley participated in investigations in which members of the Varrio Bakers were identified as potential suspects. He also investigated incidents in which they were potential victims or witnesses. He had arrested members of the Varrio Bakers, conducted formal interrogations of them, and also talked with members consensually. Consensual conversations allowed him to gather information about the gang and the particular gang member, and to expand his knowledge base concerning the gang. It also allowed him to corroborate information he had received from other people about a certain gang. In addition, Malley had read reports involving the Varrio Bakers, and spoken with quite a few other officers about them.

"Based on his training and experience, Malley opined that some of the primary criminal activities of the Varrio Bakers are shootings, assaults with deadly weapons, firearms possession, murder, attempted murder, robbery, carjacking, sales of narcotics, and witness intimidation. Malley also related that there are different levels of respect within a gang. The shot-caller has the most respect; someone who steals things or sells narcotics has the least amount, although this does not mean that person is in bad standing with the gang. Malley explained that respect is very important to the Varrio Bakers. In the gang culture, fear is often seen by gang members as being equal to respect, and it is the way they establish dominance. They gain respect from members of the community and other gangs by instilling fear into them. The more violent the types of crimes a gang member commits, the more respect that person commands within the gang. By contrast, a gang member loses respect by failing to complete an assigned task, backing down from

18.

rival gang members, or showing weakness, particularly in front of other members of the person's gang. There are disciplinary procedures that occur within the gang; discipline can consist of someone being 'checked' or beaten, and it can even consist of a member being killed if a shot-caller deems it necessary for whatever issue that needs to be settled.

"Malley was familiar with the corner of Virginia and South Robinson. It is within Varrio Bakers territory, which traditionally extends from Eye Street on the west to Washington Street on the east, and from East Brundage Lane on the south to East Truxton Avenue on the north. Malley had seen a lot of graffiti. 'VB' and 'VBKS' signify Varrio Bakers. 'X3' signifies 13. Varrio Bakers members often have tattoos. Defendant had gang tattoos, including 'Varrio' across his chest; 'VBKS' across the back of his neck; 'KC,' which local Sureño gang members often wear as a sign of pride at being a gang member from Kern County, on his right forearm; and a Kanpol—three dots with two lines underneath, signifying the number 13—on his left ring finger. Defendant also had an '805' tattoo. This is the former area code for Bakersfield. Malley explained that older gang members tend to have this tattoo rather than '661,' the current area code. Malley believed it likely defendant obtained that tattoo a long time ago. None of defendant's tattoos were fresh.

"Malley reviewed street checks and offense reports regarding defendant.[20] One was Sherman's November 2011 report, which documented defendant being contacted with Anthony Hernandez. Hernandez was a previously admitted member of the Varrio Bakers, and a registered gang offender with that gang. Malley also reviewed an offense report in which defendant was contacted on April 19, 2012, with Jose Concepcion Lopez. Malley had had previous contacts with Lopez, who was a documented Varrio Bakers and a registered gang offender with that gang. Malley also reviewed Woolard's 2005 report

---

**20** "Malley described a street check as a police officer's documentation that does not contain information regarding an arrest. It can be for anything the officer feels needs to be put on paper for future reference."

regarding defendant. Although Malley had not had any contact with defendant, he had talked with other officers about defendant.

"Based on his conversations with other officers and review of the foregoing information, Malley opined defendant was an active member of the Varrio Bakers criminal street gang at the time of trial, and was an active member in April 2012. Malley based this opinion on his experience as a patrol officer and gang investigator, and on the fact defendant was contacted within the traditional boundaries of the gang on several occasions, was known to associate with other documented members of the gang, and had tattoos on his body that only a member of that gang could obtain. Malley acknowledged, however, that a person could age out of the gang. He had spoken with members who said they had grown out of being gang members, but could still return to the neighborhood and socialize with active members. Malley had no evidence defendant had aged out. Defendant had no gang convictions and had never been ordered to register as a gang offender, however.

"Malley also reviewed information concerning Velasquez, although he had never had contact with him. After reviewing the same kind of information he reviewed for defendant, Malley opined Velasquez was an active member of the Varrio Bakers criminal street gang.

"Malley reviewed what are commonly called predicate offenses. On January 24, 2012, when documented Varrio Bakers Jose Trejo, Roman Serna, and Miguel Bravo were contacted, Serna fled and discarded a firearm. When apprehended, he was found to have 14 bindles of suspected methamphetamine on his person. All three admitted they were Varrio Bakers. Trejo later pled no contest to possession of a controlled substance for sale and gang participation, and was sentenced to prison. Trejo was an active member of the Varrio Bakers at the time of the offense. Malley, who had had contact with Trejo, knew him to have 'BKS' tattooed on his chest.

20.

"On July 29, 2011, documented Varrio Bakers Ronnie Garcia and an unidentified subject forced their way into an apartment and brandished a firearm. They made a female stay in a bedroom while they took property from the residence. Garcia, who ultimately pled no contest to robbery and was sentenced to prison, had tattoos of 'KC' on his neck, '100-percent goon' on his head, and 'Bakers' on his back.[21] Although Malley had not had any contact with Garcia, he had reviewed the information on him and talked to other officers about him, and opined he was an active member of the Varrio Bakers at the time of the offense.

"On August 27, 2010, officers contacted Anthony Hernandez and George Mendoza, both Varrio Bakers, walking together. During a probation search, Hernandez was found to have a large quantity of methamphetamine on his person, as well as cell phones, a pay-and-owe sheet, and currency. During a parole search at Mendoza's residence, gang writings for the Varrio Bakers Traviesos subset were located. Hernandez pled no contest to gang participation and was sentenced to prison. Although Malley had not had contact with Hernandez, he had reviewed information on him and spoken to officers about him. Malley opined Hernandez was an active member of the Varrio Bakers at the time of the offense.

"On April 22, 2010, Jesus Ramirez and Zane Hubbard, who had 'VB' tattooed on his face, carjacked and kidnapped a victim. Ramirez was convicted of kidnapping for robbery, kidnapping during a carjacking, assault with a firearm, criminal threats, victim/witness intimidation, felon in possession of a firearm, and gang participation, and sentenced to prison. Malley had had no contact with Ramirez, but had talked to other

---

**21** "Malley explained that when someone from outside the Varrio Bakers refers to a Varrio Bakers as a goon, it is a sign of disrespect. However, a lot of Varrio Bakers—particularly the younger ones—have been getting 'goon' or '100-percent goon' tattooed on their bodies as a gang identifier. Malley had contact with someone the day he testified who was a Varrio Bakers and had '100-percent goon' tattooed across his knuckles."

officers about the case and to officers who knew Ramirez. Malley opined Ramirez was an active member of the Varrio Bakers at the time of the offense.

"On February 20, 2010, officers attempted to stop a stolen vehicle that was occupied by Varrio Bakers Jaime Aguirre, Anthony Perez, and Juan Oregon. A vehicle pursuit ensued, during which shots were fired at officers from inside the vehicle. Oregon subsequently was convicted of attempted murder and assault with a deadly weapon on a police officer and sentenced to prison. Malley participated in the search for the vehicle's occupants after the pursuit, although he never met Oregon. He reviewed information on and talked to officers about Oregon, and opined he was an admitted member of the Varrio Bakers at the time of the offense.

"In response to a hypothetical question based on the evidence presented by the prosecution in the present case, Malley opined that the shooting was done for the benefit of and in association with the Varrio Bakers. He explained the shooting benefitted the gang, because people heard the gang name yelled. This would intimidate members of the nearby community. It would also intimidate members of law enforcement to know individuals were possessing firearms and roaming through their own territory, conducting business by shooting members of their own gang. The association came into play because it was a crime committed within the traditional boundaries of the gang, and a person yelling 'Varrio' was basically claiming they were the gang responsible for the shooting. It was 'kind of their calling card.' Malley acknowledged a member of a street gang could commit a crime—even murder—that was not for the benefit of the gang.

"**II**

"**DEFENSE EVIDENCE**

"Suzanna Ryan, a forensic DNA consultant, reviewed various materials, data, and reports concerning the DNA analysis conducted in this case. She noted the stained areas from the swabs from the shell casings—the areas likely rubbed on the casings—were consumed in testing. Based on her training and experience, retention of some of the

22.

sample is important so that it can be retested by the opposing side. The defense was deprived of that ability in this case.

"Ryan was concerned by the fact the samples from the six shell casings were combined.[22] Combining samples makes it impossible to know the origin of the DNA profile. In this case, it could not be determined whether the DNA profile that was eventually developed came from one casing, more than one casing, or all six casings.

"Ryan also noted the shell casings were tested for fingerprints. Latent print powders and brushes can transfer DNA. Even though a disposable brush was used in this case, the fact the same brush was used on all six casings could transfer DNA from one casing to another. This conceivably could make it look as if a person touched all six casings, when he or she only touched one. Moreover, there was no real way to tell when DNA was applied to the casings. Touching casings does not mean someone fired a gun, and the casings could have been touched two weeks before the shooting.

"Ryan explained that being a major or minor contributor has nothing to do with who touched an item last, but rather with the amount of DNA found. Ryan agreed that in this case, the DNA analysts correctly matched the major contributor to the known reference sample from defendant. In Ryan's opinion, the minor contributor was present at a level sufficient for a search of the state DNA database. This was not done." (*Chacon I*, *supra*, F069786.)

---

[22] "Although the Bakersfield Police Department crime scene unit laboratory technician who processed the shell casings for DNA used a separate swab for each casing, the criminalist from the Kern Regional Crime Laboratory who performed the DNA analysis combined the swabs because a swab from a single shell casing may not contain enough DNA to give a complete DNA profile."

## DISCUSSION

## I

## HEARSAY TESTIMONY[23]

As to each of counts 1 through 3, the jury found true a criminal street gang enhancement.  (§ 186.22, subd. (b).)  Additionally, as to count 1, the jury found true a gang-related special circumstance, which required the jury to find defendant was an active participant in a criminal street gang.  (§ 190.2, subd. (a)(22).)  Defendant argues, and the People concede, the gang enhancements and gang-related special circumstance must be reversed because Malley's testimony as a gang expert included inadmissible case-specific hearsay.  Defendant further argues this and other inadmissible hearsay prejudiced the verdicts on the substantive offenses of murder, attempted murder, and shooting at an inhabited dwelling.  We accept the People's concession and will reverse the jury's true findings on the gang-related allegations, but reject defendant's attack on the remainder of the judgment.

To find the gang-related allegations true, the jury was required to find the existence of a "criminal street gang."  (§§ 186.22, subd. (b), 190.2, subd. (a)(22).)  At the time defendant committed the offenses, subdivision (f) of section 186.22 defined a criminal street gang, in relevant part, as "any ongoing organization, association, or group of three or more persons . . . whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."  (§ 186.22, former subd. (f).)  Additionally, at that time, a pattern of criminal gang activity was established, in relevant part, by "the commission of . . . or conviction of two or more [enumerated] offenses, . . . committed on separate occasions, or by two or more persons."[24]  (§ 186.22, former

___

[23] For efficiency, we do not address defendant's arguments in the order they were briefed.

[24] Section 186.22 has since been amended.  (Stats. 2021, ch. 669, § 3, eff. Jan. 1, 2022.)  The amendments do not alter our analysis of this issue.

24.

subd. (e).)  When defendant's trial was conducted, California courts regularly permitted expert witnesses to testify to these so-called predicate offenses, as well as other elements of the gang-related allegations, by testifying to out-of-court statements that otherwise would constitute hearsay.  (See *Valencia*, *supra*, 11 Cal.5th at p. 832.)  At the time, courts reasoned that such testimony was not offered for the truth of the out-of-court statements, but rather as a basis for the expert's opinion.  (See *ibid.*)

However, in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), our Supreme Court partially disapproved of this procedure, holding:  "When an expert relies on hearsay to provide case-specific facts, considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth.  In such a case, 'the validity of [the expert's] opinion ultimately turn[s] on the truth' [citation] of the hearsay statement."  (*Id.* at pp. 682-683; see *id.* at p. 686, fn. 13.)  The high court therefore determined that an expert witness cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception."  (*Id.* at p. 686.)  Furthermore, to the extent the hearsay is testimonial in nature, such testimony violates the Sixth Amendment's confrontation clause unless "(1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing."  (*Sanchez*, at p. 686.)

*Sanchez* was decided during the pendency of defendant's first appeal.  In that appeal, defendant raised a single claim of *Sanchez* error:  that his confrontation rights were violated by the admission of Littlefield's hearsay testimony that Herrera reported Velasquez was a Varrio Bakers member in bad standing.  (See *Chacon I*, *supra*, F069786.)  We concluded this claim was forfeited by defendant's failure to object in the trial court and, regardless, any error was harmless in light of the jury instructions and evidence.  (*Ibid.*)  Our Supreme Court later denied defendant's petition for review

(S238667). The matter then twice returned to the trial court for further sentencing proceedings.

On February 27, 2020, while the instant appeal was pending, our Supreme Court decided *People v. Perez* (2020) 9 Cal.5th 1 (*Perez*), holding that a defendant's failure to object to case-specific hearsay at a trial conducted prior to *Sanchez* does not forfeit such claims on appeal. (*Perez*, at pp. 4, 7-14.) However, during the initial pendency of this third appeal, defendant did not seek to raise any claims pursuant to *Sanchez* or *Perez*. We issued our initial opinion in this appeal on July 7, 2020. Our Supreme Court granted defendant's petition for review, and during the pendency of that review, issued its decision in *Valencia*, *supra*, 11 Cal.5th 818. *Valencia* clarified that "[t]he circumstances of . . . predicate offenses are case-specific facts for purposes of *Sanchez*, and expert testimony about them must be supported by competent evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 311-312; accord, *Valencia*, *supra*, 11 Cal.5th at pp. 838-839.)

When the Supreme Court transferred this matter to us for reconsideration in light of *Tirado*, *supra*, 12 Cal.5th 688, we permitted supplemental briefing limited to matters arising after our previous decision. (Cal. Rules of Court, rule 8.200(b)(1), (2).) It is in this context that defendant now raises three claims of *Sanchez* error: (1) Malley's testimony about predicate offenses constituted inadmissible case-specific hearsay in violation of *Valencia*, requiring reversal of the gang-related allegations; (2) this inadmissible testimony allowed the prosecution to introduce other gang-related evidence, which prejudiced the verdicts on the substantive offenses of murder, attempted murder, and shooting at an inhabited dwelling; and (3) we should revisit our ruling from defendant's first appeal because our application of the harmless error test is contrary to *Sanchez*. We consider these arguments in turn.

A.    **Hearsay Testimony Regarding Predicate Offenses**

During defendant's trial, the prosecution presented evidence of five predicate offenses to establish a pattern of criminal gang activity. Malley testified to each of the

predicate offenses. As recounted in detail in the factual background, *ante*, nearly all Malley's testimony regarding the predicate offenses was derived from police reports and conversations with other officers.[25] As the People now concede, this testimony constituted case-specific hearsay, which prejudiced the verdicts on the gang-related allegations.

We accept the People's concession. With extremely limited exceptions, Malley's testimony regarding the facts of the predicate offenses was not based on personal knowledge and no competent evidence of these facts was tendered by any other witness. At least some of Malley's testimony in this regard was comprised of testimonial hearsay. (See *Valencia*, *supra*, 11 Cal.5th at p. 840.) We cannot conclude this testimony was harmless beyond a reasonable doubt. (*Ibid.* ["[I]f the improperly admitted hearsay is also testimonial within the meaning of the high court's confrontation clause jurisprudence [citation], the error is assessed under the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24, which requires any error to be harmless beyond a reasonable doubt."].) Absent the hearsay testimony, there was insufficient evidence to establish the elements of the gang-related allegations.[26] (See *People v. Navarro*, *supra*, 12 Cal.5th at p. 313.)

---

[25] The People also sought to admit into evidence a certified register of actions as to Ramirez, Garcia, Trejo, Oregon, and Hernandez to prove the predicate offenses. Defense counsel objected to the volume of documents and stated his willingness to stipulate "that Officer Malley's description of the crimes he specifically testified to . . . [¶] . . . [¶] . . . are true." The parties then agreed to craft a stipulation and to forego admission of the certified registers of actions. The prosecutor referred to the stipulation in closing argument, stating, "[T]he parties have agreed those predicates are just what they say they are." However, no formalized stipulation appears in the record and it appears no stipulation was provided to the jury. In light of the lack of a clear stipulation, and the People's concession of error, we do not consider the effect such stipulation may have had on defendant's claim of *Sanchez* error.

[26] At the time of trial, the jury would have been permitted to consider the underlying crimes committed by defendant as proof of the predicate offenses. (Former § 186.22, subd. (f); see *People v. Loeun* (1997) 17 Cal.4th 1, 7.) However, these offenses

27.

Accordingly we will reverse the gang enhancements (§ 186.22, subd. (b)) to all counts, and the gang-related special circumstance on count 1 (§ 190.22, subd. (a)(22)).[27] The People may retry the gang enhancements and gang-related special circumstance, if they choose. (*Navarro*, *supra*, 12 Cal.5th at p. 311 [a finding of *Sanchez* error does not prevent retrial of the overturned allegations].) In light of these reversals, we will vacate the sentence in its entirety and remand the matter for further proceedings on the reversed allegations, if any, and for a full resentencing. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 (*Buycks*) ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "]; see also *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 (*Valenzuela*) ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"].)

However, we reject defendant's contention that the hearsay testimony regarding predicate offenses prejudiced the verdicts on the substantive offenses of murder, attempted murder, and shooting at an inhabited dwelling. Defendant characterizes this testimony as a "gateway" through which the prosecutor was permitted to introduce other evidence supporting a gang-related theory of murder which, he contends, would have been inadmissible absent competent evidence to establish a pattern of criminal gang activity. He provides no support for this argument and, as we explain in greater detail below, gang-related evidence would have been admissible to prove motive and identity,

---

alone were insufficient to establish a pattern of criminal gang activity. (Former § 186.22, subd. (e) [requiring proof of two or more crimes committed "on separate occasions, or by two or more persons"].)

[27] In light of this determination, we do not address defendant's argument that the gang enhancements and gang-related special circumstance must be reversed based on recent amendments to section 186.22. (Stats. 2021, ch. 669, § 3, eff. Jan. 1, 2022.)

irrespective of proof of the elements of the gang-related allegations.  (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049-1050 (*Hernandez*).)

**B.      Hearsay Testimony Regarding Velasquez's Standing in The Gang**

Defendant also asks us to revisit our ruling from his first appeal, wherein we rejected his claim of *Sanchez* error with respect to hearsay testimony regarding Velasquez being a Varrio Bakers member in bad standing.  (*Chacon I*, *supra*, F069786.)

Even if we were inclined to revisit this issue, it is not properly before us. Defendant's briefing following transfer from our Supreme Court was limited to matters arising after our previous decision.  (Cal. Rules of Court, rule 8.200(b)(1), (2).)  *Sanchez* and *Perez* both were decided prior to our previous decision.  (See *Perez*, *supra*, 9 Cal.5th 1; *Sanchez*, *supra*, 63 Cal.4th 665.)  To the extent defendant has formulated new arguments based on these decisions, the arguments are waived.  (*People v. Murphy* (2001) 88 Cal.App.4th 392, 395 [" '[W]hen a criminal defendant could have raised an issue in a previous appeal but did not do so, the defendant may be deemed to have waived the right to raise the issue in a subsequent appeal, absent a showing of good cause or justification for the delay.' "]  We will not address them.

**II**

**SECTION 1109**

Assembly Bill No. 333 (2021-2022 Reg. Sess.), statutes 2021, chapter 699 (Assembly Bill No. 333) was enacted while review was pending and added section 1109, which requires bifurcation of the trial of gang enhancements and substantive gang offenses from that of the underlying offenses upon a defendant's request.  (§ 1109, subds. (a), (b).)  Defendant contends the newly enacted section 1109 applies retroactively to him and the court's failure to bifurcate entitles him to complete reversal of the judgment.  The People argue section 1109 does not apply retroactively and, in any event, any error in failing to bifurcate the gang-related allegations was harmless.  We conclude

29.

the failure to bifurcate the gang-related allegations was harmless under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

Courts of Appeal have split on the retroactive application of section 1109. At least two courts have held that section 1109 is not retroactive. (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Aug. 17, 2022, S275341; *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090.) At least two other courts, including this one, have held that section 1109 is retroactive. (*People v. Burgos* (2022) 77 Cal.App.5th 550, 564–569, review granted July 13, 2022, S274743; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1130; but see *Burgos*, at p. 569 (dis. opn. of Elia, J.).) Recently, in *People v. Tran* (2022) 13 Cal.5th 1169 (*Tran*), our Supreme Court declined to resolve this split of authority, concluding that "any asserted error in failing to bifurcate was harmless." (*Id.* at p. 1208.)

We therefore turn to the question of prejudice. Our Supreme Court has held that, absent a showing that the failure to bifurcate trial of the gang-related allegations violated defendant's federal constitutional right to due process, which would require us to determine whether the claimed error was harmless beyond a reasonable doubt under the *Chapman* standard, error in failing to adhere to the new statutory mandate set forth in section 1109 is subject to review under the standard articulated in *Watson*, *supra*, 46 Cal.2d 818. (*Tran*, *supra*, 13 Cal.5th at pp. 1208-1210.) We concluded in defendant's first appeal that nonbifurcation of the gang-related allegations did not amount to a due process violation. (*Chacon I*, *supra*, F069786.) Section 1109 does not alter that analysis.

Furthermore, applying the *Watson* standard, we conclude it is not reasonably probable defendant would have obtained a more favorable result had the gang-related allegations been bifurcated. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Our Supreme Court has explained: "[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices,

30.

criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled . . . ." (*Hernandez*, *supra*, 33 Cal.4th at pp. 1049-1050.) "Although evidence of a defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged—and thus should be carefully scrutinized by trial courts—such evidence is admissible when relevant to prove identity or motive, if its probative value is not substantially outweighed by its prejudicial effect." (*People v. Carter* (2003) 30 Cal.4th 1166, 1194; see *People v. Avitia* (2005) 127 Cal.App.4th 185, 192-193 [applying same principles to gang evidence generally].)

As we noted in defendant's first appeal, "at least some of the gang evidence was relevant to show defendant's motive for attacking Velasquez. 'Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. [Citation.]' [Citations.] Since the evidence was relevant to motive, it was also inferentially relevant to identify defendant as the shooter. [Citations.] The evidence was also probative of intent to kill and premeditation. [Citations.] These matters clearly were at issue in the case, even apart from establishment of the shooter's identity. As a result, at least some of the evidence would have been admissible even if the gang charge and allegations had been tried separately." (*Chacon I*, *supra*, F069786.) Additionally, "the gang evidence was no more inflammatory than the evidence related to the other charged offenses, and no evidence of uncharged criminal activity by defendant was admitted. Likewise, the predicate offenses were not unduly inflammatory. Significantly, jurors were instructed they could not infer bad character or criminal disposition from the gang evidence. The instruction cured any potential prejudice." (*Ibid.*)

31.

Furthermore, the evidence of defendant's guilt was strong. He was a major contributor to the DNA profile obtained from swabs of spent shell casings retrieved from the scene. The mother of his child placed him at the pink house, in the passenger seat of a blue SUV, on the day of the shooting. Two witnesses identified defendant in court as the shooter. Additional witnesses heard someone shouting "Varrio" or "Varrio Bakers" when the shooting commenced. Overwhelming evidence established defendant's membership in the Varrio Bakers gang and the shooting occurred in Varrio Bakers territory. In light of this evidence, as well as the admissibility of much of the gang evidence on the issues of motive and identity, it is not reasonably probable that a result more favorable to defendant would have been reached had the gang-related allegations been bifurcated. (*Watson*, *supra*, 46 Cal.2d at p. 837.) Accordingly, any error in failing to bifurcate the allegations was harmless.

### III

### THE FIREARM ENHANCEMENTS

Defendant contends the matter must be remanded for the trial court to exercise its discretion as to whether to reduce, rather than strike, the firearm enhancements.

Section 12022.53 sets out three separate sentencing enhancements for the personal use of a firearm in the commission of certain enumerated felony offenses: subdivision (b) provides for a 10-year enhancement for the personal use of a firearm; subdivision (c) provides for a 20-year enhancement for the personal and intentional discharge of a firearm; and subdivision (d) provides for a 25-year-to-life enhancement for the personal and intentional discharge of a firearm causing great bodily injury or death. (*Tirado*, *supra*, 12 Cal.5th at p. 695.) Prior to January 1, 2018, section 12022.53, subdivision (h) prohibited trial courts from striking section 12022.53 enhancements. (*Tirado*, at p. 695.) However, Senate Bill No. 620 (2017-2018 Reg. Sess.) removed this prohibition. (*Tirado*, at p. 696; Stats. 2017, ch. 682, § 2.) "Section 12022.53[, subdivision ](h) now provides that a 'court may, in the interest of justice pursuant to Section 1385 and at the time of

sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.' " (*Tirado*, at p. 696.)  Our Supreme Court has recently held that the discretion to strike or dismiss an enhancement includes the discretion to impose a lesser included, uncharged enhancement.  "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53[, subdivision ](d) enhancement, and the court determines that the section 12022.53[, subdivision ](d) enhancement should be struck or dismissed under section 12022.53[, subdivision ](h), the court may, under section 12022.53[, subdivision ](j), impose an enhancement under section 12022.53[, subdivision ](b) or (c)."  (*Id*. at p. 700.)

As discussed in section I.A., *ante*, we have concluded we must vacate the sentence in its entirety and remand for further proceedings, to include a full resentencing.  On remand, the trial court may revisit all its prior sentencing decisions in light of all new legislation and caselaw, including its exercise of discretion pursuant to section 12022.53, subdivision (h).  (See *Valenzuela*, *supra*, 7 Cal.5th at pp. 424–425; accord, *Buycks*, *supra*, 5 Cal.5th at p. 893.)  Defendant's contentions in this regard are therefore moot.

## IV

## THE MONETARY OBLIGATIONS

As previously described, at the original sentencing hearing, the trial court ordered defendant to pay the then-statutory minimum restitution fine of $240, pursuant to section 1202.4, subdivision (b), and imposed and stayed a parole revocation fine in the same amount, pursuant to section 1202.45.  The court also imposed a court operations assessment in the amount of $120 ($40 per count) pursuant to section 1465.8, and a court facilities funding assessment in the amount of $90 ($30 per count) pursuant to Government Code section 70373.  These monetary obligations remained unchanged after both remands.  At no time did defendant object.

Defendant now contends the trial court improperly imposed the monetary obligations without determining whether he had the ability to pay the amounts, in

33.

violation of his due process rights, and the matter must be remanded for the court to conduct a hearing on defendant's ability to pay.[28]  Defendant's due process argument is based on *Dueñas*, *supra*, 30 Cal.App.5th 1157, which was decided after defendant's most recent remand and while his current appeal was pending.  *Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" before it imposes any fines or fees.  (*Id*. at pp. 1164, 1167; accord, *People v. Castellano* (2019) 33 Cal.App.5th 485, 488-489.)

As stated, we have concluded we must vacate the sentence and remand for a full resentencing.  On remand, the trial court may revisit all its prior sentencing decisions, including the imposition of fines and fees.  Defendant may raise his arguments regarding ability to pay on remand.

## V

### AMENDED ABSTRACT OF JUDGMENT

After the trial court resentenced defendant on count 2 on April 26, 2017, it issued an amended abstract of judgment that reflected, inter alia, defendant's updated custody credits.  When the matter was remanded a second time for the court to exercise its discretion under section 12022.53, subdivision (h), the court orally updated defendant's credits, but did not issue an amended abstract of judgment.  Defendant's appellate attorney asked the trial court to issue an amended abstract, but the court ruled none was required since the sentence imposed on April 26, 2017, remained in full force and effect. Defendant now says we should require the trial court to prepare an amended abstract—

---

[28] The question whether a court must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments and, if so, which party bears the burden of proof regarding the defendant's ability to pay, is currently pending before the California Supreme Court.  (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

even if we are not remanding the matter—to reflect the sentence and custody credits pronounced on July 20, 2018.

Because we have concluded we must vacate the sentence and remand for a full resentencing, the trial court will be required to prepare an abstract on remand, irrespective of what occurred on July 20, 2018. Defendant's argument in this regard is therefore moot.

## VI

## ASSEMBLY BILL NO. 518

Defendant contends he is entitled to remand for reconsideration of the sentence pursuant to Assembly Bill No. 518, statutes 2021, chapter 441. Prior to its amendment by Assembly Bill No. 518, section 654 provided: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, former subd. (a).)

Assembly Bill No. 518 amended section 654 effective January 1, 2022, to provide, in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) Thus, a trial court is no longer required to impose a sentence under the offense providing for the longest possible sentence but may sentence a defendant under any one of the applicable offenses. Assembly Bill No. 518 "provides the trial court new discretion to impose a lower sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

As the People concede, defendant is entitled on remand to the benefit of Assembly Bill No. 518, to the extent applicable. (*People v. Mani*, *supra*, 74 Cal.App.5th at p. 379.)

35.

## DISPOSITION

The gang enhancements (§ 186.22, subd. (b)) to counts 1 through 3, and the gang-related special circumstance on count 1 (§ 190.22, subd. (a)(22)) are reversed and the sentence is vacated in its entirety.  The matter is remanded for further proceedings, to include a full resentencing.

DETJEN, Acting P. J.

WE CONCUR:


FRANSON, J.


SMITH, J.